NOT FOR PUBLICATION

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| S.K., on behalf of N.K., | : | |
| | : | Civil Action No. 07-4631 (SRC) |
| Plaintiff, | : | |
| | : | **OPINION** |
| v. | : | |
| | : | |
| PARSIPPANY-TROY HILLS BOARD OF EDUCATION, | : | |
| | : | |
| Defendant. | : | |
| | : | |

**CHESLER**, District Judge

This matter comes before the Court on cross-motions by Plaintiff S.K. and by Defendant Parsippany-Troy Hills Board of Education for summary judgment [docket items # 9 and 13]. (The Defendant will hereinafter be referred to as the "School District.")  Also before the Court is the School District's motion to declare the educational placement it proposes for N.K. to be his stay-put placement pending any further proceedings (the "stay-put motion") [docket item #14]. The Court has considered the briefs and other supporting papers submitted by the parties in connection with these motions, including the additional evidence submitted by Plaintiff pursuant to this Court's June 30, 2008 Order permitting Plaintiff to submit this evidence and the parties' supplemental briefing regarding the relevance of this additional evidence.  It rules on the motions without oral argument, pursuant to Federal Rule of Civil Procedure 78.

1

For the reasons that follow, the Court denies Plaintiff's motion for summary judgment, grants the School District's motion for summary judgment and denies the School District's stay-put motion.

## I.    FACTS

Plaintiff S.K. is the mother of N.K., a student in the Parsippany-Troy Hills Township School District (the "School District").  She initiated this action pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400, et seq., to appeal the decision made by administrative law judge ("ALJ") Leslie Z. Celentano that the Individualized Education Plan ("IEP") for the 2006-07 school year proposed by the School District for her son complies with the IDEA.  Upon a reevaluation of N.K., who is autistic, the School District determined that he suffered from multiple disabilities.  The challenged IEP would move N.K. from a mainstream classroom to a self-contained classroom for the third grade.  The School District proposed the challenged IEP on June 17, 2006.  S.K. disagreed with the IEP and filed a petition for due process with the Office of Administrative Law.  The ALJ issued a decision on August 31, 2007 dismissing all of Plaintiff's requests for relief and ordering that N.K. be placed in the program proposed by the School District.  This action, appealing the ALJ's decision, was initiated on September 27, 2007. Pending resolution of the parties' dispute regarding N.K.'s IEP, N.K. has remained in his mainstream classroom placement for the 2006-07 and 2007-08 school years.

The following factual summary is based on the record of the due process hearing below, including documentary evidence and testimony presented to the ALJ.

A.      Events prior to the Challenged IEP

N.K., who was ten-years old when this lawsuit was initiated, has been receiving special

education services from the School District since the 2000-01 school year.  Upon S.K.'s request,

beginning with kindergarten, in the 2003-04 school year, N.K. was placed in a mainstream

classroom setting supplemented by a home Applied Behavioral Analysis ("ABA") program.

Under the IDEA, a student's IEP must be reviewed annually.  At the 2004 annual review meeting

of N.K.'s IEP, the School District's Child Study Team proposed a change in placement for first

grade to a self-contained program that utilized ABA instruction.  Plaintiff disagreed with this

proposal and refused the proposed IEP for 2004-05.  Plaintiff and the School District mediated

their differences with respect to that IEP, and N.K. continued in his mainstream classroom

placement for his first-grade level of education.

At the 2004 annual review meeting, the parties did agree that N.K. should receive an

updated educational evaluation, which would be conducted by an independent evaluator at the

School District's expense.  Plaintiff had not, however, obtained that evaluation by the time of the

following annual review meeting in the spring of 2005.  N.K. was again placed in the mainstream

classroom for the 2005-06 school year.

In March, 2006, N.K. obtained the independent evaluation.  Dr. Margaret Kay, a certified

school psychologist with no connection to the School District.  Dr. Kay was retained by Plaintiff

for the evaluation.  She testified in the due process hearing that at the time she was retained, she

was not aware that the School District had agreed to pay for the evaluation.  She performed the

psychological and educational evaluation of N.K. on March 30,l 2006.  Upon agreement of the

parties, Dr. Kay supplemented her evaluation with observation of N.K. in school and in his home

ABA program on June 7, 2007.  The parties also agreed that Dr. Kay would issue an initial

report, based upon her March 2006 evaluation, and later produce an amended report to include

the school and home observation.  She issued her initial report in April, 2007.  The amended

report was not issued until after the draft IEP was provided by the School District to N.K.'s

mother.

### B.      The Kay Report

Dr. Kay based her initial report on an in-office evaluation involving 13 tests administered

to N.K. generally regarding his intelligence and learning abilities and on seven additional

questionnaires, completed by other individuals, regarding assessments of N.K.'s behavior.  Dr.

Kay found that N.K. "evidences poor pragmatic language usage, deficits in comprehension,

difficulty in reading and persistent difficulties in academic subjects involving problem solving

and complex concept formation."  (P-27, at 27.)  In Dr. Kay's opinion, these deficits were likely

to become more obvious in the future, as the necessity to engage in such thinking increases

academically.  (Id.)  N.K.'s test results, Dr. Kay noted, evidence "severe academic under-

achievement in basic reading skills, reading comprehension and oral expression."  (Id. at 23.)

She concluded that these deficiencies indicate that "[N.K.] is not making reasonable educational

progress in his current program or placement in these academic areas."  (Id.)

Dr. Kay also found that N.K. exhibited multiple disabilities.  In her opinion, N.K. would

4

be appropriately classified under the IDEA as a student with the following disabilities: autism, specific learning disabilities (basic reading skills, reading comprehension and oral expression), attention deficit hyperactivity disorder and speech and language impairment.  (Id. at 28.)  Her recommendations for improving N.K.'s skills and performance generally call for much more individualized attention and instruction.  In sum, she recommended the following with respect to N.K.'s academic placement:

> [N.K.] is currently being provided with an elementary program in a mainstream general education curriculum.  It is clear, however, that he requires special education to develop basic reading and reading comprehension skills commensurate with his ability and to develop basic skills in math and written expression so that he has the necessary competencies before transitioning into the higher grades.  It may be necessary, therefore, to provide some of [N.K.'s] instruction outside the inclusion classroom setting using intensive specially-designed instruction methods, such as those described in this report.

(Id. at 41 (emphasis added).)

The amended Kay report, which was based on the previous evaluations plus a classroom and home observation conducted on June 7, 2007, revised this recommendation to state that "it will be necessary to provide [N.K.'s] academic instruction in a one-to-one or very small group instructional setting using intensive specially-designed instruction."  (P-26, at 49 (emphasis added).)  Dr. Kay re-iterated that she believed this approach was imperative to N.K.'s development of basic academic skills.  (Id.)  Her classroom observations revealed that N.K. was extremely distracted and disengaged during a second-grade math class.  He did not respond to the teacher's direct questions, placed his head on his desk several times, and ignored his aide.  (Id. at 32-33.)  At one point he "started cheering and shouting out loud, got up and started leaping and

jumping around his desk." (Id. at 33.)  Dr. Kay noted that he was "disruptive in the class to the

point where it was difficult at times for [the teacher] to instruct the group.  (Id. at 32.)  In

contrast, the home observation showed that N.K. worked well in a one-to-one setting, completing

discrete tasks in order to achieve the incentive - a break from instruction.  (Id. at 33-34.)

## C.    The Challenged IEP

The draft IEP prepared by the Child Study Team for N.K.'s 2006-07 school year, during

which N.K. would be in the third grade, proposed that N.K. would receive academic instruction

in a self-contained language and learning disabilities class.  An IEP meeting was convened on

June 16, 2006 but continued to the following day.  The Child Study Team provided a draft IEP to

S.K. on June 17, 2006.  S.K. attended the meeting with Anne Marie Agnello, a professional

advocate representing S.K.  S.K. expressed her disagreement with the IEP, taking the position

that N.K. should remain in his current mainstream placement.  S.K. also objected to the fact that

the draft IEP had not incorporated the opinions of Carole Fiorile and Dana Garner, behavior

analysts who had both provided services to N.K. during the 2005-06 school year and believed he

could remain in his mainstream placement.  The Child Study Team explained the rationale

underlying its proposal, but S.K. did not agree with Dr. Kay's findings.  Though the School

District contends that S.K. did not explain why she believed her son's placement should remain

the same, the record reflects that S.K. believed that N.K. would have fared better in his

mainstream plus home instruction program had the program been implemented properly.  The

June 17, 2006 meeting lasted for several hours, but the School District and S.K. could not reach

an agreement.

The School District produced a revised and final proposed IEP after this meeting.  This IEP incorporated the recommendation of the amended Kay report as well as the input offered by Dr. Fiorile and Ms. Garner.  Based on this information, the School District's Child Study Team, agreeing with Kay's analysis, proposed that N.K. receive all his academic instruction in a self-contained autism class using Applied Behavior Analysis ("ABA") techniques.  Because the School District did not have an intermediate age autistic class utilizing the ABA techniques, the IEP proposed that N.K. be placed out of district.  The July 17, 2006 letter by the School District to S.K., under cover of which the final proposed IEP was sent to S.K., explained this and suggested several appropriate schools that could accommodate N.K. in a self-contained classroom with opportunities for mainstreaming.

S.K. did not contact the School District to discuss the proposed IEP.  She filed for due process on July 26, 2006.

**D.      The Due Process Hearing and ALJ Decision**

The administrative proceedings below commenced on October 20, 2007.  The ALJ, Judge Celentano, heard testimony from S.K.; Dr. Fiorile; Dr. Kay; Michele Goodwin, a learning consultant employed by the School District's Child Study Team; and Mary Rose Scalo, the School District's Director of Special Services.  She also considered over 200 documents, listed at the conclusion of her decision on the matter.  In a written decision issued on August 31, 2007, Judge Celentano concluded that the IEP proposed by the School District provided N.K. with an appropriate education in the least restrictive environment, according to the test articulated by the

Third Circuit in <u>Oberti v. Bd. of Educ. Of Clementon Sch. Dist.</u>, 995 F.2d 1204, 1215-17 (3d Cir. 1993).

Judge Celentano's written decision summarized the opposing viewpoints given by Dr. Kay and Dr. Fiorile in each one's respective testimony regarding an appropriate placement for N.K.  As in her report, Dr. Kay testified that N.K. was not making progress in the mainstream classroom and indeed was lacking in basic skills.  She also testified that he required instruction in a self-contained classroom now so that he could develop the skills needed for later mainstreaming at the higher grades.  Dr. Fiorile, in contrast, testified that she believed N.K. should stay in his mainstream placement, with modifications to the general curriculum, emphasis on pre-teaching and an appropriately trained aide to support N.K.  She felt that the aide who had been provided for N.K. did not meet his needs.  She also expressed concern that because the School District had not performed a Functional Behavioral Assessment of N.K., the change to an autism classroom could cause N.K. to regress academically, due to the risk that N.K. may model the behaviors of other disabled children.  Dr. Fiorile added, however, that she felt the mainstream program should continue for one more year and conceded that she would no longer recommend that placement if N.K. did not fare well.

Michelle Goodwin, the School District learning consultant who had been involved in N.K.'s program since kindergarten, testified that N.K. needs an intensive special education program to develop reading skills that other third-graders would have already established.  She also testified that he seemed to do well in the ABA home program and that in proposing the self-contained classroom, the 2006-07 IEP sought to place him in a setting in which he could derive

some educational benefit.  Additionally, she testified that the ultimate goal for N.K. would be to re-integrate him into a regular classroom and that the plan was not that he should remain in a self-contained classroom indefinitely.  Ms. Goodwin stated that, because the School District did not have an ABA classroom for N.K.'s grade level, the Child Study Team recommended several out of district placements.  She noted that their first-choice recommendation, The Children's Place, was an established public school program that utilizes ABA in the classroom.  According to Ms. Goodwin, mainstreaming opportunities at The Children's Place include homeroom, lunch, extracurricular activities, class parties, and electives.

Mary Rose Scalo's testimony did not offer much, if any, information with regard to the challenged IEP.  She testified that the School District would have an intermediate ABA class for the 2007-08 year.  That class, she stated, would have mainstreaming opportunities, such as lunch, field trips and homeroom.

S.K.'s testimony expressed her disagreement with the proposed IEP.  She acknowledged receiving report cards documenting N.K.'s underachievement in fundamental subjects, such as language arts, and difficulty attending to instructions in a large group setting.  S.K., however, stated that she disagreed with those reports.  S.K. felt that her son had made great progress in his social skills and oral expression by spending three years in a mainstream classroom.  She also testified that N.K.'s program of mainstream plus home ABA instruction had its problems but attributed them to the implementation of the program, and in particular to inconsistencies in the one-to-one home instruction and an aide who did not work well with N.K.

Ultimately, Judge Celentano concluded that the evidence supported Dr. Kay's viewpoint and the proposed IEP.  The decision states: "The evidence overwhelmingly demonstrates that three years of regular classroom instruction have failed to confer an educational benefit and have negatively affected other students."  (Aug. 31, 3007 Decision, OAL Dkt. No. EDS 09651-06, at 10.)  Judge Celentano also found that S.K.'s complaints that the School District had committed procedural violations under the IDEA in connection with the challenged IEP to lack merit.  She concluded that the School District had fulfilled its IDEA obligation and ordered as follows:

> I **CONCLUDE** that the petitioner has failed to meet her burden to establish that the proposed IEP fails to provide an appropriate, least restrictive placement for N.K.  It is hereby **ORDERED** that N.K. shall be placed in the self-contained class with mainstreaming as provided for in the IEP.  The due process complaint is **DISMISSED**.

(Id. at 12-13 (emphasis in original).)[1]

---

[1] At the time of the due process hearing, New Jersey applied the rule articulated in Schaffer v. Weast, 546 U.S. 49, 62 (2005), which placed the burden of proof on the party seeking relief in an administrative hearing challenging an IEP.  In that case, the Supreme Court noted that several states had enacted laws overriding this default rule, though it declined to address the issue of whether such burden allocation by states was permissible.  Subsequent to Schaffer, New Jersey enacted legislation placing the burden on a school district.  See N.J.S.A. 18A:46-1.1.  That provision, however, took effect on January 13, 2008 and applies to due process proceedings requested in writing after the effective date.  (Assemb. No. 4076, 212th Leg., 2d Sess. (N.J. 2007)).

## II.   Legal Background

### A.      Individuals With Disabilities Education Act, 20 U.S.C. 1400 *et seq.*

The IDEA is the vehicle created by Congress to ensure states follow a mandate to provide a "free and appropriate education" ("FAPE") to all disabled children.  20 U.S.C. §1412. "Educational instruction specially designed to meet the unique needs of the handicapped child," coupled with services "necessary to permit the child to 'benefit' from the instruction" constitute a FAPE.  Susan N. v. Wilson Sch. Dist., 70 F.3d 751, 756 (3d Cir. 1995).

For each child identified as eligible for special education, a written statement called an IEP is developed.  The IEP, which addresses and includes several elements as provided under 20 U.S.C. §1414(d)(1)(A), is designed to ensure implementation of a FAPE for the child.  S.H. v. State-Operated Sch. Dist. of Newark, 336 F.3d 260, 264 (3d Cir. 2003).  In addition to defining the content required, IDEA provides that an IEP should be developed considering the strengths of the child, concerns of the parents, and recent evaluations of the child.  Id.  The team responsible for developing the IEP consists of the child's parent(s), at least one of the child's special education teachers, a curriculum specialist and, if the parent or school board requests, a person with special knowledge or expertise related to the child's education.  Id.; see also 20 U.S.C. §1414(d)(1)(B).  The IDEA further mandates that the team review the IEP annually "to determine whether the annual goals for the child are being achieved."  20 U.S.C. §1414(d)(4).

11

The IDEA states a strong preference for 'mainstreaming,' in other words, requiring education in the least restrictive environment.  20 U.S.C. § 1412(a)(5)(A).  The Third Circuit has interpreted this requirement to mean "mandating education 'in the least restrictive environment that will provide [the student] with a meaningful educational benefit.'"  S.H., 336 F.3d at 265 (quoting T.R. v. Kingwood Twp. Bd. Educ., 205 F.3d 572, 578 (3d Cir. 2000)).  "The least restrictive environment is one that, to the greatest extent possible, satisfactorily educates disabled children together with children who are not disabled, in the same school the disabled child would attend if the child were not disabled." Carlisle Area Sch. Dist. v. Scott P., 62 F.3d 520, 535 (3d Cir. 1995).

The IDEA does not require that a school district maximize a student's potential or provide the best possible education.  Rather, the statutory obligation is satisfied "by providing personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction."  Bd. of Educ. v. Rowley, 458 U.S. 176, 203 (1982).  The IEP must provide "meaningful" access to education, id. at 192, and confer "some educational benefit" upon the child.  Id. at 200.  In order to be appropriate, however, this educational benefit must be more than "trivial."  Ridgewood Bd. of Educ. v. N.E., 172 F.3d 238, 247 (3d Cir. 1999).  An appropriate IEP is "gauged in relation to the child's potential," and must offer the potential for "significant learning" and "meaningful benefit."  Id.

When a parent believes a school district has not provided their child with a FAPE as required under IDEA, he or she may object to the IEP and request a due process hearing or a mediation conference.  See Lascari v. Bd. of Educ., 116 N.J. 30, 36 (1989) (citing applicable

New Jersey state regulations).   Once an ALJ issues a final order following a due process hearing,

the aggrieved party may appeal that decision to a state court of competent jurisdiction or to a

federal district court.  20 U.S.C. § 1415(c)(2).

>    **B.**    **Standard of Review**

Plaintiff initiated this action seeking review and reversal of the ALJ decision pursuant to

the IDEA, 20 U.S.C. § 1415(i)(2)(A).  The statute directs that the Court base its decision on the

preponderance of the evidence.  The action is, however, essentially an appeal of the

administrative decision. "[J]udicial review in IDEA cases differs substantively from judicial

review in other agency actions, in which the courts are generally confined to the administrative

record and are held to a highly deferential standard of review." Susan N., 70 F.3d at 757 (citation

omitted).   IDEA jurisprudence instructs, however, that the Court must afford some deference to

the ALJ's decision. Carlisle, 62 F.3d at 527.  In Rowley, the Supreme Court announced a

distinctive standard of review which federal courts must apply when reviewing an ALJ's

decisions under IDEA:

> [T]he provision that a reviewing court base its decision on the
> "preponderance of the evidence" is by no means an invitation to the courts
> to substitute their own notions of sound educational policy for those
> school authorities which they review.  The very importance with which
> Congress has attached to compliance with certain procedures in the
> preparation of an IEP would be frustrated if a court were permitted simply
> to set state decisions at nought.   The fact that § 1415(e) requires that the
> reviewing court "receive the records of the [state] administrative
> proceedings" carries with it the implied requirement that due weight shall
> be given to these proceedings.

Rowley, 458 U.S. at 206.   In short, the purpose of the "due weight" standard is to "prevent the court from imposing its own view of preferable educational methods on the states."  Id.  The Third Circuit has emphasized that a district court reviewing an ALJ's decision under the IDEA is not conducting a pure de novo review.  S.H., 336 F.3d at 269.  While the district court is not bound by an ALJ's factual findings, it must consider them, affording them deference in the court's discretion.  Carlisle, 62 F.3d at 527.

### III.   ANALYSIS OF SUMMARY JUDGMENT MOTIONS

#### A.   The Challenged IEP's Compliance with the IDEA

The principal question before the Court is whether Judge Celentano correctly decided that the IEP proposed by the School District for 2006-07 would provide N.K. with an appropriate education in the least restrictive placement.  Under the modified de novo review applicable to these proceedings, the Court must make an independent determination based on a preponderance of evidence regarding whether the proposed placement of N.K. in a self-contained, autism classroom satisfies the requirements of the IDEA.  Oberti, 995 F.2d at 1219. This Court finds, under applicable Third Circuit precedent, that the challenged IEP satisfies the IDEA's mandate to confer a meaningful educational benefit upon N.K. in the LRE.

In Oberti, the Third Circuit adopted a two-part test to determine whether an IEP complies with the IDEA's LRE requirement.  The first part of the test examines whether the student can be educated satisfactorily in the regular classroom, supported by supplementary aides and services.  Oberti, 995 F.2d at 1215.  When applying this prong, our courts have considered the following

factors:

> (1) the steps the school district has taken to accommodate the child in a regular classroom; (2) the child's ability to receive an educational benefit from regular education; and (3) the effect the disabled child's presence has on the regular classroom.

M.A. v. Voorhees Township Bd. of Educ., 202 F.Supp.2d 345, 365 (D.N.J. 2002) (citing Oberti, 995 F.2d at 1215-17).  The second part of the test applies if the Court determines that the child should be placed outside the regular classroom.  If that is the case, the Court must examine whether the school has made efforts to mainstream the child, that is, "made efforts to include the child in school programs with non-disabled children whenever possible."  Id.

Plaintiff has argued that the ALJ did not apply the Oberti test correctly.  Plaintiff contends that the ALJ "embraced" Dr. Kay's report and recommendation, which Plaintiff has characterized as placing undue importance on N.K.'s achievement of academic improvement.  Plaintiff argues that this contravenes the LRE mandate of the IDEA, which favors mainstreaming over providing the child with the best academic instruction.  Plaintiff takes the position that the challenged IEP is not adequately tailored to N.K.'s individualized needs, in that it overlooks what Plaintiff believes is the reason that the mainstreaming program has not maximized N.K.'s potential - inadequate supports and an improperly trained aide.

Plaintiff correctly notes that the IDEA does not require a child to be placed in the setting where he or she might achieve the best academic instruction.  "A determination that a child with disabilities might make greater academic progress in a segregated, special education class may not warrant excluding that child from a regular classroom environment."  Oberti, 995 F.2d at

1217 n. 4.  This case, however, presents a situation far from a choice between an acceptable but perhaps mediocre education in a regular classroom setting and a superior academic experience in a self-contained classroom.

The facts demonstrate that N.K. has not been educated successfully in a regular classroom.  As of the time of the Kay report and development of the challenged IEP, N.K. had been accommodated in a regular classroom from kindergarten through the second grade.  The School District assigned him a one-to-one aide and provided him with additional in-home instruction through an ABA program.  It also provided other supplementary services, such as parent training, a Behavior Intervention Plan and modifications in the classroom to tailor lessons to his needs. The record shows that, despite these supports and accommodations,  N.K.'s current mainstream placement fails to provide him with a meaningful educational benefit.  N.K. appears to be unable to receive instruction in a regular classroom setting, even with the assistance of a one-to-one aide.  Indeed, N.K.'s inability to achieve basic language, reading comprehension and math skills, as confirmed by the battery of cognitive tests Dr. Kay administered in connection with the preparation of her report, demonstrates that the mainstream placement has failed to provide him with anything beyond a trivial education benefit.  Moreover, the Kay report, prepared by an expert chosen by Plaintiff, unequivocally states that N.K. will only fall farther behind if he continues in a group classroom environment where he receives lessons with non-disabled children.  The Kay report also documents N.K.'s disruptive behavior during Dr. Kay's observation of N.K.'s participation in a math lesson with non-disabled children in a regular classroom.

The testimony offered in the due process proceedings provides abundant support for the ALJ's determination.  The Court finds Dr. Kay's opinions particularly persuasive, given her thorough examination of N.K., her lack of connection to the School District, and her selection by S.K. herself to perform the independent re-evaluation of N.K.   Her opinion is not, as Plaintiff characterizes it, that N.K. would achieve superior academic benefits in a self-contained classroom, but rather that a self-contained placement is necessary for N.K. to develop the fundamental skills he has failed to develop in the several years he has spent in regular classroom. S.K.'s dissatisfaction with Dr. Kay's assessment of her son has led her to disavow Dr. Kay's report.  Plaintiff now urges the Court to reject it, based on arguments that amount to no more than S.K.'s mere disagreement with Dr. Kay's opinion.

The additional evidence submitted by Plaintiff does not further Plaintiff's position with respect to the challenged IEP, and in fact, only provides additional documentation of N.K.'s lack of progress in his continued mainstream placement during the pendency of this action.  If a court hears additional evidence it is "free to accept or reject the agency findings depending on whether those findings are supported by the new expanded record and whether they are consistent with the requirements of the Act." S.H., 336 F.3d at 270 (quoting Oberti, 995 F.2d at 1220).  Even when a court decides to allow additional evidence, as it has done, it must not engage in "Monday Morning Quarterbacking."  Susan N., 70 F.3d at 762 (citing Furhmann v. East Hanover Bd. of Educ., 993 F.2d 1031, 1040 (3d Cir. 1993)).  The question before the Court is the reasonableness of the IEP at the time it was created.  Id.  Thus, even if the additional evidence showed, to echo Plaintiff's characterization, that N.K. has made meaningful progress in his continued regular

classroom placement during 2006-07 and 2007-08, the Court must be careful not to assess the reasonableness of the individualized program with the benefit of hindsight.  The additional evidence supplied by Plaintiff does not contain information that would have been available to the School District in the spring of 2006, when it prepared the challenged IEP.  Nor does it contain, as was the case with the after-acquired expert report in <u>Brett S. v. The West Chester School District</u>, material dealing with the "events and decisions that were the subject of the due process hearing."  <u>Brett S. v. The West Chester Sch. Dist.</u>, No. 04-5598, 2006 U.S. Dist. LEXIS 10249, at *26 n. 18 (E.D. Pa. Mar. 15, 2006) .

Instead, the additional evidence provides a glimpse into how N.K. has fared in the two years following the ALJ's August 31, 2007 decision.  The handwritten notes concerning N.K.'s one-to-one home ABA instruction generally report positive sessions, with the instructor, Aatifa Hammond, commenting on successfully completed tasks and progress made by N.K.  He continued in his mainstream placement with class work that was, according to the third-grade teacher, "significantly modified in all content areas so that selected concepts are presented in a format with limited language and writing demands."  (2006-07 Report Card, attached to Mar. 20, 2008 Mayerson Aff. as Ex. K.)  Despite the modified class work and the pre-teaching of the selected concepts at home, N.K. struggled to keep up.  His report card, which grades N.K. only on the areas in which received modified work, evaluates his reading, writing, and speaking skills as predominantly at the "Not Yet Performing" or "Partially Proficient" level.  "Not Yet Performing" means that the student has been introduced to a concept or skill and does not demonstrate understanding, and "Partially Proficient" means that the student is developing an

understanding of a concept or skill with inconsistent application.  His mathematics skills are

likewise evaluated as falling into these categories of poor performance, with some proficiency

noted in performing standard numerical operations using a calculator.  The third-grade report

card also shows a lack of grading in areas such as critical and inferential thinking skills,

application of new writing strategies and skills, speaking, and the ability to solve math problems.

The teacher comments explain that "areas on the progress report that do not receive a numerical

indicator are those areas in which [N.K.] is not receiving modified work because he still does not

demonstrate the necessary prerequisite skill base to perform in those areas at this time."  (Id.)  In

conclusion, the third-grade report card states that "promotion to grade 4 is with teacher

reservation."  (Id.)  The report card for the first half of N.K.'s fourth grade year shows

improvement but still demonstrates poor performance in reading comprehension, critical

thinking, and the ability to solve math problems.  (2007-08 Report Card, attached to Mar. 20,

2008 Mayerson Aff. as Ex. R.)  A November 16, 2007 Functional Behavior Assessment of N.K.

in his mainstream placement documents that N.K. displays disruptive behaviors and engages in

conduct to avoid academic instruction.  (Mar. 20, 2008 Mayerson Aff., Ex. N.)   He refuses to

participate in tasks other than completing worksheets that have been pre-taught at home.  He

displays a pattern of ignoring prompts by aides but will respond to individualized attention from

the teacher.  The assessment does note, however, that N.K. does not engage in avoidance

behaviors during music and gym and socializes well with his peers during lunch and recess.  In

sum, the significant deficiencies in basic skills remain, and the additional evidence shows that

N.K. has not been able to obtain meaningful educational benefit in the regular classroom.

Though the IDEA favors mainstreaming where possible, this statutory preference has its limits.  Clearly, N.K.'s experience with the current mainstream placement demonstrates that it has not been successful in educating him.  N.K.'s failure to achieve more than negligible benefit during his three years' worth of regular classroom instruction provides persuade this Court that the challenged IEP's proposed placement of N.K. in a self-contained classroom was "'reasonably calculated to enable the child to receive education benefits.'"  <u>Furhmann</u>, 993 F.2d at 1039-40 (quoting <u>Rowley</u>, 458 U.S. at 206-07).

Having determined that the first prong of the <u>Oberti</u> analysis supports placement of the child outside of the regular classroom, this Court now looks to whether the School District, in the proposed IEP, has made efforts to mainstream the child whenever possible.  Clearly, the answer is yes.  The first choice for out-of-district placement, The Children's Place, operates in a public school system and offers all the mainstreaming opportunities available in the system.  According to learning consultant Michele Goodwin, who testified that she is familiar with The Children's Place and has visited the school, these opportunities include lunch, homeroom, class trips and, when appropriate, art and music class.

The inclusion opportunities in an out-of-district placement may, however, be moot at this point.  The evidence shows that the School District proposed this placement because no intermediate ABA class was available in the School District for the 2006-07 year at issue.  The School District's Director of Special Education, Mary Rose Scalo, testified that an appropriate self-contained classroom would be available for 2007-08.  As of the date of this Opinion, the 2008-09 school year is already underway, and it is not clear to the Court whether in-district

placement is possible.  If so, inclusion opportunities also exist in the School District, as Ms. Goodwin's testimony reflects.

In sum, the due process record and additional evidence offered by Plaintiff in the instant civil action fail to support Plaintiff's position that a continuation of the mainstream program would be appropriate where the program, implemented for N.K.'s first through third grades of schooling, have yielded extremely poor results.  A program which would simply continue a demonstrably unsuccessful IEP does not satisfy the IDEA mandate that the individualized education plan for a disabled student such as N.K. confer a meaningful educational benefit.  An appropriate IEP must offer "more than a trivial or de minimis educational benefit." Oberti, 995 F.2d at 1213.  Thus, the Court finds that the ALJ correctly determined that the IEP provides N.K. with an appropriate education in the least restrictive setting.

### B.      N.K.'s Classification As "Multiply Disabled"

Plaintiff has also challenged N.K.'s re-classification from autistic to multiply disabled. The Child Study Team adopted the multiply disabled classification based on the Kay report's findings that N.K. not only met the diagnostic criteria for autism but also struggled with learning disability, attention deficit hyperactivity disorder and a communication impairment.  S.K. feels that N.K. should be classified as having "high functioning autism" or "Asperger's Disorder." The School District indicates that both of these would fall under the IDEA's autism classification.

New Jersey regulations define "multiply disabled" as "the presence of . . . concomitant impairments, the combination of which causes such severe educational problems that programs

designed for the separate disabling conditions will not meet the students educational needs."
N.J.A.C. 6A:14-3.5(c)6.  The evidence supports the "multiply disabled" classification.  Dr. Kay
testified that N.K.'s various impairments impact his ability to learn and must all be taken into
account when planning his program.  Plaintiff has not presented any evidence, other than her
personal opinion, regarding her position on N.K.'s classification.

Thus, the Court sees no reason to disturb the Child Study Team's "multiply disabled"
classification of N.K.

### C.    Procedural Violations

Plaintiff has raised the argument that several procedural violations she believes were
committed in connection with the challenged IEP have effectively denied her son his IDEA
entitlement to a FAPE.  She maintains that the IDEA's procedural safeguards were violated in
three material ways: (1) the School District predetermined N.K.'s program and deprived her of
her right, as his parent, to participate meaningfully in the IEP process; (2) the School District
failed to develop goals and objectives for N.K.'s IEP; and (3) the School District failed to
complete a Functional Behavior Assessment and transition plan for N.K.

The predetermination argument appears to be based on the fact that the Child Study Team
had drafted an IEP before meeting with S.K. to discuss and plan N.K.'s individualized program.
A disabled child's parent must be able to participate in the development of an IEP.  Fuhrmann,
993 F.2d at 1036.  Predetermination of an IEP may be found where the parent is excluded from
the process or where the parent's participation amounts to no more than mere "after the fact

involvement." <u>Id.</u>   A school district's preparation of a draft IEP, prior to meeting with the

child's parent, does not alone indicate predetermination.   <u>Id.</u> (finding that child's parents had

opportunity to participate in meaningful way where the school district presented them with draft

IEP, discussed it with them and incorporated their suggestions into the IEP).


In the proceedings below, Judge Celentano considered the predetermination argument but

found it meritless, observing that the School District's conduct appeared to amount to no more

than preparation for the IEP meeting and that S.K. had not provided any evidence that she had

been deprived of meaningful participation.  Rather, Judge Celentano found the evidence showed

that discussion of the plan and other options at the IEP meeting was frustrated by S.K.'s

unwillingness to consider alternatives to a fully mainstreamed program.  Giving due weight to

the ALJ's factual findings, this Court agrees that the evidence does not support Plaintiff's

argument that she was denied her procedural right to participate meaningfully in the development

of N.K.'s IEP.

The School District's preparation of a draft IEP does not, without more, indicate that S.K.

was excluded from the process.  "School officials are permitted to form opinions and compile

reports prior to IEP meetings."  <u>Deal v. Hamilton County Bd. of Educ.</u>, 392 F.3d 840, 858 (6th

Cir. 2004).  School officials must, however, have an open mind, be "willing to listen to the

parents," and engage in a discussion with the parents about the plan.  <u>Id.</u>  The record shows that

the Child Study Team and S.K. talked for at least two hours about the plan, but that the talks

were unproductive because S.K. insisted on continuing the full mainstream program that N.K.

was in.  The Court has not been presented with evidence that the meeting with S.K. was a mere

formality or that the program drafted by the Child Study Team for N.K. was a foregone

conclusion and would not have been revised to incorporate his mother's suggestions.  Plaintiff's

argument appears to be rooted in the School District's adherence to the self-contained classroom

placement and to the multiply disabled classification, in spite of her disagreement with those

designations.  However, "meaningful participation does not require deferral to parent choice."

Sch. for Language and Commc'n Dev. v. N.Y. State Dep't of Educ., No. 02-cv-269, 2006 U.S.

Dist. LEXIS 73297, at * 23 (E.D.N.Y. Sept. 26, 2006); see also Walczak v. Fla. Union Free Sch.

Dist., 142 F.3d 119, 132 (2d Cir. 1998) ("What the statute guarantees is an 'appropriate'

education, 'not one that provides everything that might be thought desirable by loving parents.'"

(quoting Tucker v. Bay Shore Union Free Sch. Dist., 873 F.2d 563, 567 (2d Cir. 1989)).

Plaintiff's other procedural violation claims also fail.  She complains that the School

District failed to define goals and objectives, but the challenged IEP states goals for N.K.

throughout the plan.  She also complains that although the placement change from a regular

classroom to a self-contained ABA classroom would represent a significant, and potentially

traumatic shift for N.K., the School District did not conduct an Functional Behavior Assessment

to identify and address N.K.'s problematic behavior in his mainstream placement and did not

develop a transition plan for N.K.  The validity of these claims was not addressed below; rather,

the ALJ found that they would not negate the appropriateness of the education proposed by the

IEP.  In the briefing submitted on the instant motions, Plaintiff provides no legal authority to

support her position that these failures constitute procedural violations that invalidate the FAPE

proposed for N.K.  See Deal, 392 F.3d at 854.  While compliance with the procedural

requirements of the IDEA is important, "[a] finding of procedural violations does not necessarily

entitle appellants to relief. Only if a procedural violation has resulted in substantive harm, and

thus constitutes a denial of a FAPE, may relief be granted."  Id. (citation omitted).  In fact,

Plaintiff does not indicate exactly what provision or the IDEA or of its implementing regulations

regarding procedure has been allegedly violated.

Thus, the Court finds that Plaintiff's claims of procedural violations do not warrant a

finding that the challenged IEP fails to provide an appropriate education.

## IV.  STAY PUT PLACEMENT

The School District has also filed a motion to declare the placement proposed by the

subject IEP N.K.'s "stay-put" placement pending any further appeal by Plaintiff.  More

specifically, the School District has requested that, in the event this Court affirms Judge

Celentano's decision, the Court follow the position recently articulated by the United States

Department of Education with regard to a child's education placement at this procedural

juncture.  For the reasons set forth below, the Court denies the School District's motion.

The IDEA contains a provision that functions as an automatic preliminary injunction

during the pendency of any administrative or judicial proceedings in which a child's education

program or placement is in dispute.  The "stay-put provision," as it is commonly known,

provides that "during the pendency of any proceedings conducted pursuant to this section, unless

the State or local educational agency and the parents otherwise agree, the child shall remain in

the then-current educational placement of the child."  20 U.S.C. § 1415(j).  The relevant IDEA

regulation, and its counterpart in the New Jersey Administrative Code, direct that a child remain

in his or her current educational placement "during the pendency of any administrative or judicial

proceeding regarding a due process complaint."  34 C.F.R. § 300.518(a); N.J.A.C. 6A:14-2.7(u).

The stay-put provision dispenses with the need for the Court to weigh such factors as irreparable

harm and likelihood of success on the merits and removes the Court's discretion regarding

whether an injunction should be ordered.  Drinker v. Colonial Sch. Dist., 78 F.3d 859, 864 (3d

Cir. 1996).  Its purpose is to maintain the status quo for the child while the dispute between the

parent and the school district remains unresolved.  Ringwood Bd. of Educ. v. K.H.J., 469

F.Supp.2d 267, 270-71 (D.N.J. 2006).

 Plaintiff's initiation of due process review of the challenged IEP in August 2006,

pursuant to 20 U.S.C. § 1415, triggered the § 1415's automatic preliminary injunction.  Thus,

Plaintiff continued in his then-current mainstream placement during the due process proceedings,

which did not conclude until Judge Celentano issued her August 31, 2007 decision.  Plaintiff's

initiation of this civil action, essentially appealing the administrative decision affirming the

challenged IEP, again triggered the stay-put provision.  N.K. has completed the third and fourth

grades of schooling in his mainstream placement, although the challenged IEP, which pertained

to N.K.'s third-grade education for 2006-07, called for a change to a self-contained classroom.

 According to the language of the IDEA and its related regulations, a further appeal by

Plaintiff of this Court's decision would continue the dispute over the challenged IEP and would

therefore presumably continue the injunction keeping N.K. in his mainstream placement.  The

26

School District, however, has moved that the Court declare the placement described by the 2006-07 IEP N.K.'s stay-put placement.

The "relevant inquiry under [the IDEA's stay-put provision] is the identification of 'the then current educational placement'" of the student with disabilities.  Drinker, 78 F.3d at 865 (concerning stay-put provision then-codified at 20 U.S.C. § 1415(e)(3)).  Our jurisprudence defines the "then current educational placement" as the IEP "actually functioning when the stay-put is invoked."  Id. at 867.  According to the Third Circuit's analysis in Drinker, the pendency placement would be "the operative placement actually functioning at the time the dispute first arises."  Id. (quoting Thomas v. Cincinnati Bd. of Educ., 918 F.2d 618, 625-26.)  In other words, it is generally the placement associated with the child's most recent IEP.  Susquenita Sch. Dist. v. Raelee S., 96 F.3d 78, 83 (3d Cir.1996).  Moreover, stressing that Congress intended to preserve the status quo while a child's placement or program was in dispute, the Third Circuit has held that if there is no IEP in effect when the dispute arises, the placement under which the child is actually receiving instruction will be the stay-put placement.  Pardini v. Allegheny Intermediate Unit, 420 F.3d 181, 190-91 (3d Cir. 2005) (citing Thomas, 918 F.2d at 625-26).

The Supreme Court and the Third Circuit have held that the IDEA's stay-put provision unequivocally states "that the child shall remain in the then current educational placement" throughout the proceedings.  Honig v. Doe, 484 U.S. 305, 323 (1988); Pardini, 420 F.3d at 190.  "The provision represents Congress' policy choice that all handicapped children, regardless of whether their case is meritorious or not, are to remain in their current educational placement until the dispute with regard to their placement is *ultimately resolved*."  Drinker, 78 F.2d at 864

27

(emphasis added).

The School District's argument for declaring the now twice-affirmed IEP placement as the pendency placement going forward focuses on the federal and state regulations providing that a child's placement can change during the pendency of proceedings if the school district and parents agree.  34 C.F.R. § 300.518(a); N.J.A.C. 6A:14-2.7(u).  The applicable regulations further provide that if an ALJ decides that a parent's proposed change in placement for his or her child is appropriate, then the ALJ's decision must be deemed an agreement between the school district and the parent and that "agreed-upon" placement becomes the pendency placement.  34 C.F.R. § 300.518(d); N.J.A.C. 6A:14-2.7(u)(1).  The School District maintains that a September 4, 2007 letter by the Acting Director of the Department of Education's Office of Special Education Programs ("OSEP"), providing guidance on the establishment of pendency rights by virtue of 34 C.F.R. § 300.518(d) (hereinafter, the "OSEP letter") militates in favor of changing the pendency placement from the status quo placement N.K. was in when his mother filed for due process in August 2006 to the placement called for by the judicially-sanctioned 2006-07 IEP.  The letter comments on the effect of an un-appealed administrative decision, in favor of the parent, in a system with two-tiered administrative review.  It explains that an un-appealed decision is final, and the decision thus becomes the child's current educational placement.  The letter adds:

> In a single-tier system, the result of the initial hearing [in which the decision favors the parent] must be treated as the child's current educational placement, pending any judicial appeals by either party . . .

> The same decision rules apply if it is the local agency requesting the change in placement.  If the hearing officer agrees with the local agency, in a two-tier system, and the parent does not appeal the decision, the placement is that determined by the hearing decision.  If the parent appeals the decision, the child's placement at the time the first-tier hearing was requested is the child's placement until the result of the appeal.  Once the second-tier placement decision is made, that placement becomes the child's placement during any subsequent judicial appeals.

(OSEP letter, at 2, attached to School District's Br. as Ex. A.)

The OSEP letter, which could at most serve an instructional or persuasive purpose, fails to support the School District's position.  In one respect, it stands for the mundane and basic rule that a decision that is not appealed becomes final.  That commentary is irrelevant to the issue presented in this stay-put motion.  In another, it seems to assert that a stay-put placement based on the last operative IEP must be given effect only through the second-tier of a two-tiered review system.  In the paragraph quoted above, OSEP states that upon a second-tier decision affirming a school district's proposed change in placement, that placement becomes the pendency placement.  Based on that statement, the School District in this case argues that OSEP is expressing its position that, in a two-tier system, agreement between a second-tier ALJ and a school district regarding placement can function in the same way as agreement between the ALJ and the parent and operate to change the pendency placement.  The School District further argues that implicit in that statement is OSEP's opinion that in a one-tier administrative review system, such as New Jersey's, the Court should view the district court affirmation of an ALJ decision calling for a

placement change as justifying a change in the pendency placement.

If the OSEP letter in fact stands for that proposition, then it runs counter to the express language of the IDEA, federal and state regulations and Third Circuit precedent regarding what a proper stay-put placement is and the duration of the placement. The law states that the child's placement at the time of the due process request is the stay-put placement until the dispute regarding the child's program or placement is ultimately resolved. The Court lacks authority to declare that N.K.'s pendency placement going forward should be changed from the mainstream plus home ABA instruction placement actually functioning when the subject dispute first arose to the placement approved by Judge Celentano and this Court.

Accordingly, the School District's stay-put motion must be denied.

## V. CONCLUSION

As required by the standard, this Court has reviewed the record, the additional evidence submitted by Plaintiff, and the papers of the moving parties. Having done so, this Court finds that the ALJ correctly determined that the 2006-07 IEP provides N.K. an appropriate education in the least restrictive environment. Accordingly, Plaintiff's motion for summary judgment seeking reversal of the ALJ decision will be denied, and the School District's cross-motion seeking affirmance of the ALJ decision will be granted. Further, for the reasons expressed above, the School District's motion that the Court declare the placement proposed by the subject IEP to be N.K.'s stay-put placement will be denied.

An appropriate form of order will be filed herewith.


                                            /s Stanley R. Chesler
                                            Stanley R. Chesler, U.S.D.J.


Dated:          October 9, 2008